RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0012p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

DAYTON POWER & LIGHT COMPANY, dba AES Ohio,
American Electric Power Service, DUKE ENERGY
OHIO, INC., and FIRSTENERGY SERVICE COMPANY (21-
4072/22-3351); AMERICAN ELECTRIC POWER SERVICE
CORPORATION (22-3196/23-3366); OFFICE OF THE
OHIO CONSUMERS' COUNSEL (23-3324/3417),
                                        *Petitioners*,


        *v.*


FEDERAL ENERGY REGULATORY COMMISSION,
                                        *Respondent*.

Nos.  21-4072 /22-3351 /23-3196 /
3324 /3366 /3417

─────────────

On Petitions for Review of Orders the Federal Energy Regulatory Commission.
Nos. ER20-1068-000; ER20-1068-003; EL22-34-000; EL22-34-001.

Argued:  May 8, 2024

Decided and Filed:  January 17, 2025

Before:  MOORE, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Matthew E. Price, JENNER & BLOCK LLP, Washington, D.C., for Petitioners.
Carol J. Banta, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for
Respondent.  Thomas G. Lindgren, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Intervenor Public Utilities Commission of Ohio.  **ON BRIEF:**  Matthew E.
Price, Zachary B. Cohen, JENNER & BLOCK LLP, Washington, D.C., William M. Rappolt,
AES US SERVICES, LLC, Arlington, Virginia, William M. Keyser, STEPTOE & JOHNSON
LLP, Washington, D.C., Morgan E. Parke, P. Nikhil Rao, FIRSTENERGY SERVICE
COMPANY, Akron, Ohio, Sanford I. Weisburst, QUINN EMANUEL URQUHART &
SULLIVAN, LLP, New York, New York, for the Dayton Power & Light Co. et al. Petitioners.
Carol J. Banta, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for
Respondent.  Thomas G. Lindgren, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Intervenor Public Utilities Commission of Ohio.  Denise C. Goulet, Wendy

Simon Pearson, MCCARTER & ENGLISH, LLP, Washington, D.C., for Petitioner Office of the Ohio Consumers' Counsel in 23-3324 and 23-3417 and as an Intervenor in 21-4072, 22-3351, 23-3196, and 23-3366. Paul M. Flynn, Ryan J. Collins, WRIGHT & TALISMAN, P.C., Washington, D.C., for Intervenor PJM Interconnection, L.L.C. Cynthia S. Bogorad, David E. Pomper, Jeffrey M. Bayne, Lauren L. Springett, SPIEGEL & MCCIARMID LLP, Washington, D.C., for Intervenor Buckeye Power. Heather M. Horne, DUKE ENERGY CORPORATION, Washington, D.C., Matthew A. Fitzgerald, MCGUIREWOODS LLP, Richmond, Virginia, for Intervenor Duke Energy Ohio, Inc. Sanford I. Weisburst, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, Morgan E. Parke, P. Nikhil Rao, FIRSTENERGY SERVICE COMPANY, Akron, Ohio, for Intervenor FirstEnergy Service Company in 23-3324, 23-3366, and 23-3417.

BLOOMEKATZ, J., delivered the opinion of the court in which NALBANDIAN, J., concurred, and MOORE, J., concurred in part. NALBANDIAN, J. (pp. 35–39), delivered a separate concurring opinion. MOORE, J. (pp. 40–45), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

BLOOMEKATZ, Circuit Judge. In 2005, Congress amended Section 219 of the Federal Power Act (FPA), directing the Federal Energy Regulatory Commission (FERC) to make the country's electric grid more efficient, reliable, and affordable for consumers. Among other measures, Congress mandated that FERC "provide for incentives to each . . . electric utility that joins" a regional transmission organization (RTO). 16 U.S.C. § 824s(c). RTOs operate regional electricity grids and facilitate competition, efficiency, and reliability. They also lower consumer prices. Following Congress's instruction, FERC promulgated a rule allowing utilities to charge higher wholesale electricity rates as an incentive for joining an RTO. *See Promoting Transmission Investment Through Pricing Reform*, 116 FERC ¶ 61,057 (2006). We call that surcharge the "RTO adder." Consistent with Congress's goal of encouraging RTO participation, FERC ultimately determined that a utility can qualify for the higher rate only if it *voluntarily* joins an RTO. FERC thus excludes utilities that are required to join an RTO by state law because the extra payment cannot "incentivize" membership.

Ohio law requires utilities to join an RTO, so FERC denied the application of Dayton Power, an Ohio utility, for an RTO adder. Then, prompted by a challenge from the Ohio

Consumer's Counsel (OCC), FERC removed the adder from another Ohio utility, AEP. But FERC left the adder intact for two others, Duke and FirstEnergy. Duke's and FirstEnergy's rates came from comprehensive settlement agreements, and FERC viewed the adder as inseparable from those settlements.

These consolidated appeals of FERC's rulings in the Dayton Power and OCC proceedings raise two main questions. *First*, was it arbitrary and capricious for FERC to deny RTO adders to utilities in states requiring RTO membership, either because FERC's voluntariness requirement conflicts with the FPA or because those state laws are preempted and therefore should pose no obstacle to FERC approving the RTO adder? *Second*, assuming FERC's interpretation stands, was it arbitrary and capricious for FERC to remove the adder from AEP's rates, but not from Duke's and FirstEnergy's? We conclude that the best reading of the relevant FPA provision supports FERC's determination that utilities must voluntarily participate in an RTO to receive the RTO adder. We also hold that state laws mandating such participation are not preempted by the FPA. Therefore, we affirm FERC's determination in the Dayton Power proceeding. Yet we conclude that FERC treated AEP differently than Duke and FirstEnergy without a meaningful distinction. Based on the Dayton Power proceeding, the adder should have been excised from all three companies' rates. Accordingly, we vacate FERC's determination in the OCC proceeding and remand for further proceedings consistent with this opinion.

## BACKGROUND

The legal questions in this case arise from the complex statutory and regulatory scheme governing the electricity market in the United States. We begin by describing relevant parts of the market and legal scheme. *See Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 843 (6th Cir. 2021) (providing a "simplified" overview of the "interstate wholesale electricity market" because it's "not exactly everybody's cup of tea").

I.        **Overview of the Wholesale Electricity Market[1]**

Electric service has three primary steps: generation, transmission, and distribution. Energy Primer at 47. Power plants first generate electricity using coal, natural gas, nuclear fuels, or renewable energy. *Id.* at 48. Next, large transmission lines carry electricity over long distances from plants to cities and towns across the country, forming electricity grids. *Id.* at 36–37, 47; Reliability Primer at 16. Finally, transmission lines connect to local distribution lines that deliver electricity directly to homes and businesses. Energy Primer at 47. Each step of the process involves different entities and subsidiaries. Together, they deliver power to consumers.

Most people, when they pay their electric bill, are buying electricity from a retail energy supplier. Those transactions form the retail electricity market. But before electricity reaches consumers, it gets traded on a wholesale market and transmitted across the electrical grid. *Id.* at 35. The wholesale electricity market consists of generators, transmission utilities, and other entities that buy and sell electricity in bulk so that consumers can then access electricity on-demand. *Id.* at 36–37. Here, we focus on laws and regulations affecting the wholesale market for electricity.

Regional wholesale markets don't work particularly well unless the entities involved coordinate and share transmission lines. *See id.* Consider what would happen if they didn't. Each utility would need to pay to build its own lines or use other companies' lines to transmit electricity long distances, creating a high barrier to market entry. *See Louisville Gas*, 988 F.3d at 844. Utilities would face severe limitations on where they could deliver electricity, hindering competition. *See* Energy Primer at 37, 39. And they would need to maintain substantial power reserves to avoid outages. *See id.* at 36–37. These challenges would result in higher prices to customers. Coordination addresses those problems. For instance, by sharing transmission lines, utilities can borrow from one another's reserves as needed to prevent unnecessary outages without having to keep huge reserves. *See id.* Coordination affects whether consumers can

---

[1]Our overview draws from FERC's "Energy Primer" and "Reliability Primer." *See* FERC, Staff Report, Energy Primer: A Handbook of Energy Market Basics (2020), https://perma.cc/GGF6-BGFJ; FERC, Reliability Primer (2020), https://perma.cc/LFJ2-L84G.

access electricity on demand and what they ultimately pay down the line to power their homes. *Id.*

Given these benefits, Congress acted to facilitate sharing and coordination of electric transmission. Before Congress got involved, some utilities entered bilateral agreements, and others joined multilateral arrangements called "power pools." *Id.* at 38–39. Some of these power pools evolved into autonomous transmission organizations called Independent System Operators (ISOs) or Regional Transmission Organizations (RTOs). *Id.* at 39. RTOs (which are the focus of this case) and ISOs are nonprofit entities that take over operational control of transmission lines from the utilities that own them. *Id.* One of the largest RTOs in the country is PJM Interconnection (PJM), which coordinates the movement of wholesale electricity across a region that includes Ohio and all or parts of 12 other states plus the District of Columbia. *Id.* at 85; PJM Br. at 6. Utilities in an RTO submit bids or offers for generation directly to the RTO, which evaluates and matches buyers and sellers. This process creates competition in the wholesale electricity market and ensures a balanced, coordinated flow of electricity across the grid. Energy Primer at 39, 61. The result: a more reliable power supply and competition leading to lower rates. *Id.*

But RTO membership comes with significant hurdles. Because RTOs operate independently of their members, to join one, utilities that own and operate transmission lines must cede operational control to the RTO. *Id.* Then they must compete for business in a structured market environment. *Id.* at 39, 62–66.

## II.     The Statutory and Regulatory Scheme

Congress gave FERC power to regulate the wholesale electricity market. The FPA gives FERC authority over "transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," including any rates and charges. 16 U.S.C. § 824(a). It also explicitly preserves states' power to oversee *intra*state transmission of electricity. *Id.* § 824(a), (b)(1).

***Return on Equity (ROE).*** As part of its authority, FERC approves the wholesale rates at which entities sell electricity. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016)

(citing 16 U.S.C. § 824d(a)).  FERC sets rates by considering how much, on balance, a utility would need to earn to continue to attract investment.  *See Boroughs of Ellwood City v. FERC*, 731 F.2d 959, 967 (D.C. Cir. 1984) (citing *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944)); *Emera Me. v. FERC*, 854 F.3d 9, 19–21 (D.C. Cir. 2017).  That figure is known as the "return on equity," or ROE.  But FERC must also ensure that the utility's rate is "just and reasonable."  *Emera Me.*, 854 F.3d at 19 (quoting 16 U.S.C. §§ 824d(a), 824e(a)).  To set a utility's rate, FERC compiles the ROEs of a "proxy group of comparable publicly traded companies," removes outliers, and "assembles a zone of reasonable ROEs on which to base a utility's ROE."  *Id.* at 21 (cleaned up).  That range is called the "zone of reasonableness."  *Id.* Within the zone, FERC determines a utility's precise rate based on its specific circumstances.

*Section 219.*  Congress also gave FERC authority to encourage RTO membership. Although RTOs benefit customers, some utilities have hesitated to join them.  *See* Energy Primer at 39.  As mentioned, membership in an RTO requires a utility to relinquish operational control of its transmission capabilities, 18 C.F.R. § 35.34(f), and request permission if it ever wants to withdraw, *see Louisville Gas*, 988 F.3d at 845.

Understanding this challenge, in 2005, Congress amended Section 219 of the FPA to direct FERC to establish incentives for utilities that join an RTO.  Energy Policy Act of 2005, Pub. L. No. 109-58, § 1241, 119 Stat. 594, 961 (codified as amended at 16 U.S.C. § 824s). Congress did not mandate RTO membership.  Rather, it gave FERC broad authority to "establish, by rule, incentive-based (including performance-based) rate treatments" to improve transmission of electricity. 16 U.S.C. § 824s(a).  Congress mandated that FERC promulgate one specific type of incentive-based rate treatment in Section 219(c), stating that FERC "shall . . . provide for incentives to each transmitting utility or electric utility that joins [an RTO]."  *Id.* § 824s(c).[2]   In requiring FERC to create this and other "incentive-based" rate treatments, Congress's stated "purpose [was] benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion."  *Id.* § 824s(a).  With incentives, perhaps Congress could overcome some of the barriers to RTO membership.  Congress further

---

[2]Section 219(c) covers utilities that join "Transmission Organization[s]" generally, but we refer only to RTOs because no other type of transmission organization is relevant to this appeal.  *See* 16 U.S.C. § 824s(c).

ordered that any incentive-based rate treatment given be "just and reasonable and not unduly discriminatory or preferential." *Id.* § 824s(d).

**Order 679.** To implement Congress's directive to "provide for incentives" to each utility that joins an RTO, FERC promulgated Order 679. *Id.* § 824s(c); *Promoting Transmission Investment Through Pricing Reform*, 116 FERC ¶ 61,057 (2006) (codified at 18 C.F.R. § 35.35) (Order 679).[3] FERC created an "adder" for utilities that join an RTO, which permits them to charge a premium above their baseline ROEs. It also allowed utilities to recoup "prudently incurred costs associated with joining" an RTO. 18 C.F.R. § 35.35(e). The practical upshot: utilities garner an above-market return on equity, a cost borne initially by wholesale purchasers but ultimately shouldered by consumers via higher electric bills.

In Order 679, FERC decided to grant RTO adders on a "case-by-case basis" by reviewing individual applications from utilities that had joined RTOs. Order 679 ¶ 326. It rejected comments urging that all utilities with membership in an RTO should "automatically qualify" for the adder. *Id.* ¶¶ 318, 326–27. It also rejected comments suggesting "that the incentive should not apply where a transmission owner is ordered to join [an RTO] by statute or has agreed to join [an RTO] as a condition of receiving approval for a merger, market-based rates, or because of other regulatory actions." *Id.* ¶ 316. FERC instead explained that "[a] prior contractual commitment or statute may have a bearing" on its "evaluation of individual applications." Order 679-A ¶ 122. Rather than create categorical eligibility criteria, FERC decided that it could "fulfill[] the Congressional mandate" by considering incentives "on a case-by-case basis" and approving them "when justified." Order 679 ¶ 326. A utility would "be presumed to be eligible for the incentive" if it could "demonstrate that it has joined an RTO." *Id.* ¶ 327. But it was just that—a presumption, not an entitlement. *See id.*

FERC also stated it would allow utilities that had joined an RTO before it promulgated Order 679 to qualify for the adder if they maintained their membership. *Id.* ¶ 331. FERC reasoned that "[t]he basis for the incentive is a recognition of the benefits that flow from membership in such organizations *and the fact [that] continuing membership is generally*

---

[3]FERC affirmed its rule on rehearing. *See Promoting Transmission Investment Through Pricing Reform*, 117 FERC ¶ 61,345 (2006) (Order 679-A).

*voluntary.*"  *Id.* (emphasis added); *see also* Order 679-A ¶ 86 & n.142.  In response to criticisms of this policy, Order 679-A ¶¶ 80–81, FERC explained that offering the adder as an "inducement for utilities to join, and remain in" RTOs served Section 219's goal of "ensuring reliability and reducing the cost of delivered power," *id.* ¶ 86.  FERC worried that without the adder, existing RTO members "with the option to withdraw" would have "no inducement to stay."  *Id.* "[I]ncentives," FERC reasoned, "are equally important in inducing utilities to join and remain" in RTOs.  *Id.* ¶ 86 n.142.

### III.    The RTO Adder at the Ninth Circuit

Even though Order 679 mandated a case-by-case approach, in practice FERC "summarily granted" requests for a 50-basis-point RTO adder.[4]  *Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 972 & n.3 (9th Cir. 2018) (*CPUC I*).  It routinely approved adders for some utilities that were RTO members without scrutinizing their individualized circumstances.  This practice continued until a 2018 Ninth Circuit decision—known to the parties as *CPUC I*—prompted FERC to begin examining the "specific circumstances" underlying utilities' requests for RTO adders.  *See id.* at 979.[5]

In that case, the California Public Utilities Commission (CPUC) challenged Pacific Gas & Electric's (PG&E) application for an RTO adder.[6]  *Id.* at 972.  It argued that a CPUC order mandated PG&E's continued participation in the RTO, and "granting it incentive adders would reward PG&E for doing something it was already required to do," needlessly increasing costs for consumers.  *Id.*  FERC summarily granted the adder, pointing to Order 679.  *Id.*  CPUC petitioned the Ninth Circuit to reverse FERC, arguing that it was arbitrary and capricious for

---

[4]A "50-basis-point" adder refers to a 0.5% upward adjustment to a utility's base ROE, or the rate of return a utility would ordinarily receive as determined by the market cost of production.  As far as the record demonstrates, the RTO adder has always been 50 basis-points.  Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act, 86 Fed. Reg. 21972, 21973 (proposed Apr. 26, 2021) (to be codified at 18 C.F.R. pt. 35).  While FERC could adjust this figure in its case-by-case review, it hasn't.  *Id.* (noting that FERC has RTO adders of 50 basis points, not more and not less, "without modification"); Order 679 ¶ 326.

[5]According to FERC, the question of whether utilities are eligible for the RTO adder if state law requires them to join an RTO did not "come up" and was not challenged until *CPUC I. Dayton Power* Oral Arg. at 34:00.

[6]Although the *CPUC* litigation concerned membership in an ISO rather than an RTO, for simplicity's sake, we refer to RTOs throughout.  *See* Energy Primer at 39 (referring to RTOs and ISOs interchangeably).

FERC to grant PG&E an incentive adder without considering whether it had *voluntarily* continued to participate in the RTO.  *Id.* at 972–73.

The Ninth Circuit agreed, deeming FERC's approval "plainly erroneous and inconsistent with" Order 679.  *Id.* at 974.  It emphasized two main points.  *First*, FERC violated Order 679 by not examining "incentives on a case-by-case basis" as required "even for utilities that have demonstrated ongoing membership" in an RTO.  *Id.* (citation omitted).  Rather than undertaking individualized review, FERC had summarily approved adders for PG&E solely based on its RTO membership.  *Id.* at 978–79.  *Second*, FERC hadn't considered whether PG&E joined the RTO voluntarily, which Order 679 required.  *Id.* at 974–75, 978.  The Ninth Circuit emphasized that FERC created the adder as "an *inducement* for utilities to join[] and remain in" RTOs, justified by "*the fact that continuing membership is generally voluntary*."  *Id.* at 974 (citations omitted).  As a result, the court concluded that the adder is "presumably not justified" when membership is involuntary.  *Id.*  And by rubberstamping PG&E's adders, FERC had departed from its "longstanding policy that incentives should only be awarded to induce voluntary conduct."  *Id.* at 978.

On remand, FERC reaffirmed its approval of PG&E's RTO adder.  *Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454, 458 (9th Cir. 2022) (*CPUC II*).  FERC determined that, despite CPUC's claims, California law did not mandate RTO participation.  *Id.* at 461.  The Ninth Circuit affirmed, clarifying that *CPUC I* had not definitively ruled on whether state law required membership.  *Id.* at 462–63.  Because federal law is the source of the right to the incentive adder, the court saw no need to defer to California's interpretation.  *Id.* at 463–64.  And, the court reasoned, because FERC's interpretation of California law was correct, it properly granted PG&E the adder.  *Id.* at 466–68.  So PG&E kept its adder, but the decision served as a wake-up call for FERC to engage in an individualized review of each RTO adder application and even reevaluate existing adders.

## PROCEDURAL HISTORY

The consolidated petitions before us arise from two separate FERC proceedings.  In the first, FERC denied an application from Dayton Power & Light Company, a transmission utility

based in Ohio, for an RTO adder.  Following *CPUC I*, FERC determined that utilities could be eligible for the RTO adder only if they voluntarily joined an RTO.  This interpretation excludes all transmission utilities operating in Ohio, including Dayton Power, since state law compels their RTO membership.  Ohio Rev. Code § 4928.12.[7]  The Ohio Consumers' Counsel (OCC)— the state entity that represents the interests of Ohio residential utility customers before courts and regulatory bodies—initiated the second proceeding.  It challenged existing RTO adders charged by three other Ohio transmission utilities, American Electric Power Service Corporation (AEP), FirstEnergy Service Company, and Duke Energy Ohio, Inc.  FERC rejected OCC's petition to subtract the RTO adder from Duke's and FirstEnergy's rates but granted it with respect to AEP's.  We detail both proceedings.

**I.        *Dayton Power* Proceeding**

In the *Dayton Power* proceeding, FERC formally adopted the view that, under Order 679, a utility that is legally required to join an RTO is ineligible for the RTO adder.  In early 2020, Dayton Power applied for a package of incentives, including the RTO adder for its membership in PJM.  *See Dayton Power & Light Co.*, 172 FERC ¶ 61,140 (Aug. 17, 2020), JA96.  It claimed presumptive eligibility for the adder and argued the incentive would help finance new transmission projects.  But it did not tie its request for the RTO adder to any project.  Instead, it noted that its current transmission rates predated its RTO membership, it had not had a rate case since then to request an RTO adder, and even without any infrastructure projects, it was eligible for the RTO adder given its participation in PJM.  OCC opposed the application, stressing Ohio's mandatory RTO membership law and the *CPUC I* ruling.

FERC concluded that Dayton Power was ineligible for the RTO adder under Order 679 because Ohio law required it to join an RTO.  *Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (July 15, 2021) (*Dayton I*), JA173.  Order 679, FERC emphasized, said an adder could be "appropriate for entities that choose to remain" in an RTO because "continuing membership is generally voluntary."  *Id.* at JA183 (cleaned up).  But for Dayton Power, continued membership

---

[7]In the FERC proceeding, the parties disputed whether Ohio law mandates RTO membership.  *Dayton Power & Light Co.*, 172 FERC ¶ 61,140 P 19 (Aug. 17, 2020), JA102.  On appeal the utilities did not challenge's FERC's conclusion that it does, so we do not consider the question.

wasn't voluntary. And, as *CPUC I* held, the adder could function as an "incentive" or "inducement" only if membership is voluntary. *Id.* at JA183–84 (citing *CPUC I*, 879 F.3d at 974–79). FERC therefore held that "a showing that RTO membership is voluntary is a prerequisite to granting . . . an RTO Adder," making Dayton Power ineligible. *Id.* at JA184.

FERC rejected both of Dayton Power's main arguments. Pointing to the FPA, Dayton Power argued that "section 219 does not explicitly require voluntariness." *Id.* at JA182. FERC disagreed because, as explained in Order 679 and *CPUC I*, Section 219(c) tasks FERC with providing "incentives," which can induce only voluntary behavior. *Id.* at JA182–86. Alternatively, Dayton Power argued that it technically joined an RTO voluntarily, because the FPA preempts the Ohio law requiring membership. Dayton Power urged FERC either to interpret the Ohio law as nonmandatory to avoid preemption concerns or to treat the statute as federally preempted. FERC determined that Ohio law did require RTO membership but declined to address preemption arguments. It declared that it lacked the authority to nullify a state statute, which only a federal court could do. So, the ratemaking proceeding was an inappropriate vehicle for addressing preemption.

FERC later dismissed Dayton Power's petition for rehearing, maintaining its stance that Order 679 made voluntary membership a prerequisite for the RTO adder. *Dayton Power & Light Co.*, 178 FERC ¶ 61,102 (Feb. 17, 2022) (*Dayton II*), JA280. FERC again rejected Dayton Power's argument that the voluntariness requirement conflicted with Section 219(c)'s text and deemed it an improper collateral attack on Order 679. And it reiterated that federalism principles prevented it from considering the utility's preemption arguments.

## II.    *OCC* **Proceeding**

Following *Dayton Power*, OCC filed a complaint seeking to remove the RTO adders for AEP, Duke, and FirstEnergy.[8] *OCC v. AEP, et al.*, 181 FERC ¶ 61,214 (Dec. 15, 2022) (*OCC I*), JA464–65. OCC argued that these Ohio utilities could no longer charge the adder because, like

---

[8]AEP, Duke Energy, and FirstEnergy are transmission-owning utilities that operate (or own subsidiaries that operate) in Ohio and are members of the PJM RTO. *OCC I* at JA467–68. Although American Transmission Systems Inc. (ATSI) was a party in the Commission proceedings, we refer to ATSI by the name of its parent company, FirstEnergy, which intervened in this case to defend the ruling with respect to ATSI.

Dayton Power, their RTO participation is legally mandated. AEP, Duke, and FirstEnergy responded that their rates resulted from settlement negotiations and removing the adder would undermine those agreements.[9] *Id.* at JA476–77, 484–85. FERC agreed as to Duke and FirstEnergy, but not for AEP. *Id.* at JA485.

Starting with AEP, FERC stressed that it independently approved its RTO adder in 2008 and 2010 *before* settlement negotiations about AEP's ROE. *Id.* at JA486. Because FERC "specifically evaluated and granted RTO Adders" to AEP's Ohio affiliates "on a single-issue basis, separate from all other ROE issues," FERC reasoned that it could "reevaluate and revise those specific incentives on a single-issue basis" too. *Id.* AEP argued that a settlement produced its overall rate structure, and removing the RTO adder would disrupt that agreement. But FERC remained unconvinced. It explained that it "granted the adder prior to setting the base ROE," so "when the parties entered into settlement discussions, they knew they were negotiating *only* the base ROE." *Id.* at JA486 n.123 (emphasis added). Thus, the RTO adder constituted a distinct, excisable component of the settlement.

By contrast, FERC never approved a standalone RTO adder for Duke or FirstEnergy. Instead, FERC approved rates that emerged from complex settlements the utilities negotiated with consumer groups. Both utilities' negotiated rates appeared to include RTO adders. Duke's approved settlement explicitly incorporated "a 10.88% base cost of common equity and a 50-basis point ROE adder," and FirstEnergy's settlement specified that "the agreed-upon ROEs were inclusive of any incentive adder for RTO participation." *Id.* at JA488. But FERC had approved the settlements as a whole, not piecemeal. And it declined to "disturb one aspect of these comprehensive settlements absent a showing that the resulting overall ROEs are unjust and unreasonable." *Id.* at JA489.

AEP and OCC requested rehearing. AEP contended that FERC arbitrarily distinguished its case from Duke's and FirstEnergy's and disregarded its earlier finding (in an unrelated

---

[9]The utilities also argued that because their operations span multiple states that do not mandate RTO participation, FERC could not uniformly remove a 50-basis-point adder from all their transmission service rates. *OCC I* at JA479–80, 485, 492. OCC responded by explaining that interstate operations could impact "the scope of the remedy," but did not justify dismissing the complaint entirely. *Id.* at JA482–83. The utilities do not reassert this argument on appeal. Because the scope of the remedy is not before us, we do not address it here.

proceeding) that AEP had voluntarily joined PJM.  *See OCC v. AEP, et al.*, 183 FERC ¶ 61,034 (Apr. 20, 2023) (*OCC II*), JA590–92, 594–95.  OCC argued that FERC improperly kept Duke's and FirstEnergy's RTO adders.  *Id.* at JA583–86.  FERC denied both requests.

## ANALYSIS

Dayton Power, AEP, FirstEnergy (referred to collectively as "the utilities"), and Duke petitioned for review of the *Dayton Power* orders.**[10]**  *See* Notice of Appeal, No. 21-4072, D. 1.  AEP and OCC petitioned for review of the *OCC* orders.  *See* Notice of Appeal, No. 23-3366, D. 1; Notice of Appeal, No. 23-3417, D. 1.   We consolidated the cases and granted several organizations' requests to intervene.  *See* Order, No. 21-4072, D. 33; Order, No. 21-4072, D. 50.

## I.        Standard of Review

In reviewing FERC's decisions, we examine questions of law de novo.  *Louisville Gas*, 988 F.3d at 846.  We further review agency decisionmaking to determine whether it is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  This scope of review is "extremely narrow."  *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 720 (6th Cir. 2022) (quoting *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1352 (6th Cir. 1991)).  For arbitrary and capricious review, we may not substitute our judgment for FERC's.  *Id.* (citing *Greenbaum v. EPA*, 370 F.3d 527, 542 (6th Cir. 2004)).  FERC, however, must have "articulate[d] a satisfactory explanation" for its orders, "including a rational connection between the facts found and the choice made."  *Louisville Gas*, 988 F.3d at 846 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  We must examine whether FERC considered "relevant factors" or whether it made "a clear error of judgment."  *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).  The core of the analysis is whether FERC engaged in "reasoned decisionmaking."  *Louisville Gas*, 988 F.3d at 846 (quoting *State Farm*, 463 U.S. at 52).

---

**[10]**Duke initially petitioned for review of the *Dayton Power* orders, but it did not join the opening brief filed by Dayton Power, AEP, and FirstEnergy and did not advance any arguments related to the *Dayton Power* proceeding.  *See* Utilities' Br. at 65–66.

## II.        The *Dayton Power* Proceeding

We begin with the many challenges to the *Dayton Power* proceeding.  Our analysis proceeds in three main parts.  *First*, we examine the lawfulness of Order 679's voluntariness requirement, addressing both the utilities' ability to bring this challenge and the correct interpretation of Section 219(c).  *Second*, we analyze the utilities' preemption arguments, considering whether FERC should have addressed them in the first instance and whether the FPA supersedes Ohio law.  *Third*, we evaluate whether FERC arbitrarily denied Dayton Power's RTO adder application given its past practice of granting the adder to similarly situated utilities.

### A.        Lawfulness of Order 679

The utilities challenge FERC's conclusion that voluntariness is a prerequisite to obtaining an RTO adder.  Before us, they do not challenge FERC's view (and the Ninth Circuit's) that Order 679 requires voluntary membership.  Instead, they argue that Order 679's voluntariness requirement directly contradicts Section 219(c) of the FPA and therefore cannot stand.  According to the utilities, Section 219(c) requires FERC to award RTO adders "to each" utility "that joins" an RTO, regardless of whether their participation was voluntary.  Utilities' Br. at 28–30 (quoting 16 U.S.C. § 824s(c)).

FERC and its supporting intervenors offer two responses—one procedural and one substantive.  On procedure, FERC argues that the utilities may not, now, collaterally attack Order 679's legality.  On substance, the intervenors contend that Order 679 aligns with Section 219(c).  We consider these issues in turn.

### 1.        Impermissible Collateral Attack

Before examining the utilities' Section 219 challenge, we must resolve a predicate procedural question: Is this challenge an impermissible collateral attack on Order 679?  In general, parties may not collaterally attack agency rules.  *See Flat Wireless, LLC v. FCC*, 944 F.3d 927, 930–31 (D.C. Cir. 2019).  A collateral attack occurs when a party challenges a rule's legality in a later proceeding, rather than contesting it directly after its issuance.  *E.g.*, *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 825 (D.C. Cir. 2008) (barring a challenge to FERC's RTO

study requirement as an impermissible collateral attack).  Here the utilities challenged Order 679's validity in the *Dayton Power* ratemaking proceeding—not directly after FERC promulgated it—making this is a collateral attack.

But not every collateral attack is impermissible. The Second, Fifth, Ninth, and D.C. Circuits ask whether "a reasonable party in the petitioner's position would have perceived a very substantial risk that the order meant what the Commission now says it meant."  *City of Redding v. FERC*, 693 F.3d 828, 837 (9th Cir. 2012) (citation omitted); *see Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589 (D.C. Cir. 2002); *El Paso Elec. Co. v. FERC,* 832 F.3d 495, 509 (5th Cir. 2016); *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 105 (2d Cir. 2015).  If not, these circuits allow the collateral attack.   We haven't defined what constitutes an "impermissible" collateral attack, but we do so here, adopting the "very substantial risk" standard.

This standard follows from first principles.  As the D.C. Circuit explained, "unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958).  And "limiting the right" for parties to challenge the "underlying rule" to right after the agency promulgates it "would effectively deny many parties ultimately affected by a rule an opportunity to question its validity."  *Id.*   Consider, too, if courts prohibited collateral challenges to agency orders altogether.  Then regulated parties would have to challenge potentially unlawful interpretations preemptively without knowing their impact or understanding how the agency would apply them. That could also contravene constitutional standing requirements.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Thus, adopting a "very substantial risk" standard, as these circuits have done, makes sense.   Under this standard, the relevant question is whether "a reasonable firm" in the utilities' position "would have perceived a very substantial risk" that Order 679 precluded the RTO adder for utilities legally required to join an RTO.  *Dominion Res.*, 286 F.3d at 589 (quoting *ANR Pipeline Co. v. FERC*, 988 F.2d 1229, 1234 (D.C. Cir. 1993)).

The answer is "no."   FERC did not substantially indicate, in either Order 679 or on rehearing, an intent to categorically reject applications based on compulsory RTO membership. For starters, FERC twice rejected comments that suggested the incentive should not be allowed

for public utilities "ordered to join [RTOs] by statute." Order 679 ¶ 316; Order 679-A ¶¶ 83, 122. And Order 679's reference to encouraging "generally voluntary" RTO membership doesn't suggest a "very substantial risk" that FERC would treat voluntary participation as a prerequisite for the RTO adder. Order 679 ¶ 331. Most significantly, FERC summarily approved adders for some RTO members in the years following Order 679, without considering whether their membership was voluntary. *See CPUC I*, 879 F.3d at 978–79. That practice dispels the notion that when FERC promulgated the rule, utilities should have known it would impose a strict voluntariness requirement. Indeed, until *CPUC I*, FERC paid little attention to individualized adder determinations. *See id.*; *Dayton Power* Oral Arg. at 33:32. With FERC's revised stance on Order 679, newly affected parties should get to seek redress. As we've explained, the general rule disfavoring collateral attack "does not foreclose subsequent examination of a rule" for "review of further Commission action applying it." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 785 (6th Cir. 2023) (quoting *Functional Music,* 274 F.2d at 546). Accordingly, we proceed to the merits.

### 2.        Interpretation of Section 219(c)

Our task is to interpret Section 219(c) and determine whether FERC's voluntariness requirement is valid given the "best reading" of the statute. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). Since this case was argued, the precedents governing agency deference have shifted. *Id.* at 2272–73 (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Under the new standard articulated in *Loper Bright*, we do not defer to an agency's reasonable interpretation of a statute, but we may still "seek aid" from the agency and resort to its "experience and informed judgment" for guidance. *Id.* at 2262 (citation omitted). Deference would make no difference here. The "single, best" reading of Section 219(c) is that the RTO adder requires voluntary membership. *Id.* at 2266.[11]

---

[11]The Supreme Court recognized that Congress sometimes expressly delegates to an agency the authority to define a particular term, asks an agency to "'fill up the details' of a statutory scheme," or leaves the agency "flexibility." *Loper Bright*, 144 S. Ct. at 2263 (citations omitted). Because FERC's decision follows our reading of the statute, we need not decide here how much leeway Congress gave FERC to design its incentives.

*Text*.  Our analysis of Section 219(c) starts with its text.  *T.M. ex rel. H.C. v. DeWine*, 49 F.4th 1082, 1089 (6th Cir. 2022).  Section 219(c) reads: "In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins [an RTO]."  16 U.S.C. § 824s(c).  This language implies that joining an RTO must be a voluntary act, not a mandatory one.  Consider two key words: "joins" and "incentives."  To join an organization is "to come into [its] company" or "to associate oneself with" it.  *Join*, Merriam-Webster, https://perma.cc/TA9B-6XLU (last visited Sept. 10, 2024).  Common dictionaries provide examples like "joined the church" and "joined the Army."  *Id.*; *Join*, Collins, https://perma.cc/8FLE-N5LL (last visited Sept. 10, 2024).  While the word alone doesn't preclude mandatory participation, these examples—especially in the context of organizational membership—connote voluntary action.  *See Muscarello v. United States*, 524 U.S. 125, 131 (1998) (defining a statutory term by examining its ordinary usage); *cf. Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860, 865 (1st Cir. 1947) (noting that to "join[]" the military implies "a voluntary act in contrast to induction under duress").

"Incentive" carries an even stronger connotation of voluntariness.  An incentive is "[s]omething that incites or encourages action or production" or "spurs someone, esp[ecially] from self-interest, to seek an outcome."  *Incentive*, Black's Law Dictionary (12th ed. 2024); *see also Incentive*, Collins, https://perma.cc/F48D-FJDQ (last visited Sept. 10, 2024) ("[S]omething that incites or tends to incite to action or greater effort.").  Its synonyms include "impetus," "inducement," and "encouragement."  *Incentive*, Merriam-Webster Thesaurus, https://perma.cc/K4SW-QQY6 (last visited Apr. 21, 2024).  The very concept of inciting, inducing, or encouraging an action presumes the actor's freedom to choose whether to perform it.  *CPUC I*, 879 F.3d at 974 ("An incentive cannot 'induce' behavior that is already legally mandated.").  Indeed, an incentive can only induce joining an RTO if doing so is voluntary.

*Statutory Context*.  The statutory context reinforces this reading. Section 219(c) must be read in conjunction with 219(a).  The statute proceeds as follows. Section 219(a) broadly delegates to FERC the authority to create rate-based incentives to improve reliability and reduce the cost of electricity transmission.  It instructs that, within a year, FERC must "establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of

electric energy in interstate commerce." 16 U.S.C. § 824s(a). Section 219(c) then requires that FERC promulgate an incentive-based rate treatment for a particular action Congress wanted to incentivize: joining an RTO. It states: "In the rule issued under this section, the Commission shall . . . provide for incentives to each . . . electric utility that joins [an RTO]." *Id.* § 824s(c). Thus, while Section 219(c) identifies RTO membership as a target for incentives, any such incentive still must be in the form of an "incentive-based" rate treatment, as dictated by Section 219(a).

In the context of utilities, that term—"incentive-based" rate treatment—refers specifically to regulations offering an award to a utility that *voluntarily* takes some future action. *See* William P. Pollard, Nat'l Regul. Rsch. Inst., *Rate Incentive Provisions: A Framework for Analysis and a Survey of Activities* iii (1981) (listing "unifying ideas central to rate incentive provisions," including "motivat[ing] the utility's behavior" and addressing "aspects of a utility's performance under [its] control"); *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 138 (D.C. Cir. 2019) (affirming the "obvious proposition" that FERC cannot "create incentives to motivate conduct that has already occurred" (citation omitted)). As the statute indicates, one type of "incentive-based" rate treatment is a "performance-based" rate treatment. 16 U.S.C. § 824s(a). For a performance-based rate treatment, utilities get specified awards if they meet specific performance metrics. That is, they are encouraged to perform in a particular way by the contingent award. *See* Michael Schmidt, *Performance-Based Ratemaking: Theory and Practice* 15 (2000). Again, voluntariness is at the core. Utilities are rewarded for taking optional steps that will achieve a particular improved outcome; they are not rewarded for performance that's already required.

Section 219(b) sheds even more light. It directs FERC to provide a different "incentive-based" rate treatment, this one to "promote[]" capital investment and "encourage[]" use of technology to improve facilities' operation and capacity. 16 U.S.C. § 824s(b). Under this provision, FERC increases a utility's rate if it undertakes approved improvement projects. But FERC can "promote" or "encourage" only voluntary choices to invest, not mandatory ones. *See San Diego Gas*, 913 F.3d at 137–38. So too with RTO membership. Voluntariness is a necessary predicate to an "incentive-based" rate treatment.

The statute's final subsection reinforces our reading as well.  Section 219(d) requires that all "incentive-based" rate treatments under Section 219 be "just and reasonable."  16 U.S.C. § 824s(d) (incorporating 16 U.S.C. §§ 824d, 824e).  As FERC determined in the *OCC* proceedings, it is unjust and unreasonable to grant an increased rate to a utility mandated by law to join an RTO, when the RTO adder would not (and could not) incentivize anything.  *OCC I* at JA487.  Nor would it further Section 219's stated goals.  Congress explicitly stated that FERC's transmission incentives should "benefit[] consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion."  16 U.S.C. § 824s(a).  It did not write a blank check to utilities; it asked FERC to use a carefully calibrated tool to achieve these goals.  Giving an RTO adder to a utility that is mandated by state law to participate in an RTO would only increase the rate for that utility's transmission services—not "reduc[e] the cost"—and give the utility an unearned windfall.  *Id.*  Such an interpretation would not only fail to advance the statute's goals but actively subvert them.

The utilities and their intervenors do not convince us otherwise.  The utilities respond that the statute unambiguously "directs that an adder be given to 'each transmitting utility or electric utility that joins [an RTO],' period."  Utilities' Reply Br. at 2 (quoting 16 U.S.C. § 824s(c)).  In their view, the motivation behind a utility's decision to join is irrelevant because the adder must be granted "to each" participating utility "that joins"—without exception.  Utilities' Br. at 31.  They contend that if Congress intended to require voluntary participation, it would have used language covering utilities "that elect to join" instead of "that join."  *Id.* at 30.

This reading of Section 219(c) rests on a slender reed.  The utilities place too heavy an emphasis on Congress's choice of one word—*that* joins rather than *to* join—while reading the word "incentives" out of the statute.  *Dayton Power* Oral Arg. at 11:07–11:30.  In doing so, they also ask us to treat the word "join" as "agnostic" to voluntariness despite its plain meaning in context, which as discussed above, connotes choice.  Utilities' Br. at 30.  The sole example the utilities provide to demonstrate that "joining" an organization does not imply voluntary action shows just the opposite.  Perhaps, as the utilities proffer, when a child "joins the Cub Scouts, one doesn't ask whether the parents required the child to join, or whether the child joined voluntarily."  *Id*.  But joining the Cub Scouts is a voluntary act.  Parents effectuate voluntary

choices for their children all the time. And if you asked a child whose parents forced him, "Did you join the Cub Scouts?" expect the retort, "My parents made me go."

When they finally wrestle with the word "incentives," the utilities' interpretation is unpersuasive and inconsistent. They contend that "the incentive is what the transmission owner gets" if it's a "utility *that joins*" an RTO. *See* Utilities' Reply Br. at 6 (cleaned up). In that light, an "incentive" is an award or payment for status—here, RTO membership—not an inducement to undertake an action. That definition would contradict the plain meaning of "incentive," discussed above. For those utilities, it also would not constitute an "incentive-based" or "performance-based" rate treatment, as Section 219(a) requires. And it cannot "promote owners' membership in an RTO," which is what the utilities themselves tell us "Congress sought to . . . [do] through FPA Section 219(c)." Utilities' Br. at 1; *see also id.* at 11 (Congress added Section 219(c) "[t]o encourage RTO membership").

The utilities then backtrack, recharacterizing the RTO adder as an incentive for construction and investment in new transmission, not RTO membership. *Compare* Utilities' Br. at 1, 11, *with* Utilities' Reply Br. at 6, *and Dayton Power* Oral Arg. at 8:57–9:13 ("The behavior [Congress] was trying to incentivize was investing money, not joining an RTO."). The utilities argue that this construction-oriented view of the RTO adder aligns with the statute's goals by bolstering grid reliability and encouraging competition to drive down costs. But there are myriad problems with calling the RTO adder a construction "incentive" and not a membership inducement. Most concerning, it suffers from the same fundamental flaw as above—the utility does not have to undertake any voluntary action to get the "incentive." If the utilities were correct, utilities that simply joined an RTO (voluntarily or not) could receive an "incentive" for new investments without constructing new lines or making new investments. Nothing would stop them from using the revenue from the adder for other purposes, such as increasing shareholder dividends. Moreover, the idea that Congress created Section 219(c) to promote construction rather than RTO membership strains credulity, as Section 219(c)'s text explicitly articulates Congress's goal of encouraging RTO membership. Even the utilities concede that "Congress amended the FPA" to add Section 219(c) "[t]o encourage RTO membership." Utilities' Br. at 11. If Congress wanted to encourage transmission expansion, it would have

provided the incentive "to each" utility that makes tangible investments in new infrastructure, not each utility "that joins" an RTO.

Notably, Congress did ask FERC to promote investment in transmission infrastructure irrespective of RTO membership, just not in Section 219(c). Section 219(b), discussed above, directs FERC to "promot[e] capital investment" in transmission facilities and to "provide a return on equity that attracts new investment in transmission facilities." 16 U.S.C. § 824s(b)(1)–(2). FERC accordingly promulgated rules, including incentive-based treatments, that provide funds for utilities that voluntarily invest in new transmission projects. *See, e.g.*, 18 C.F.R. § 35.35(d), (g); Order 679 ¶¶ 91–94, 191, 270–72. Dayton Power applied for (and received) some of these construction incentives in the same proceeding at issue here. And RTO membership, voluntary or otherwise, does not affect a utility's eligibility for the new-projects adder, so the utilities here still have an incentive to engage in new transmission development. Order 679 ¶¶ 4, 49, 55, 84, 91–94, 333; Order 679-A ¶ 87 (explaining that the RTO incentive under Section 219(c) "is separate from the construction incentives" in Section 219(b)). Given Section 219(b) and the utilities' own description of Congress's goals, it makes little sense to read Section 219(c) as a mandate for FERC to motivate transmission construction, rather than RTO membership.

The statutory text and structure demonstrate that the "best reading" of Section 219(c)—one that gives full effect to both the letter and context of the law—is that the RTO adder is reserved for those utilities that voluntarily choose to join an RTO.

### B.        Preemption

Several utilities mount a second and independent challenge to FERC's *Dayton Power* decisions: preemption. They argue that, even assuming that voluntariness is a required or permissible consideration for approving the RTO adder, their participation in PJM was voluntary because Ohio cannot force them to join an RTO. That is, any such state law requiring RTO membership—here, Ohio Rev. Code § 4928.12(A)—is preempted by federal law. Citing federalism concerns, FERC declined to address the substance of this argument below and urges us not to address it on appeal. We disagree. FERC should have addressed preemption arguments in the *Dayton Power* proceeding as it has done in others. The issue has now been briefed, the

utilities have asked us to address it, the State of Ohio has weighed in as amicus, and FERC told us during oral argument that it does not want us to remand for its views and that its views would not be entitled to deference. *But see Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (holding that we may accord weight to agency views on how state law impacts federal schemes depending on agency's thoroughness, consistency, and persuasiveness). Therefore, we consider the utilities' preemption argument and hold that the FPA does not preempt state laws requiring RTO membership.

### 1. FERC's Abstention

The parties first dispute whether it is even appropriate for us to address preemption. FERC says we should abstain from wading into preemption questions, while the utilities ask us to resolve preemption in their favor. FERC refused to address preemption in the *Dayton Power* proceeding, reasoning that because only federal courts could make "the ultimate determination" on preemption, ratemaking proceedings were "not an appropriate procedural vehicle" for the argument. *Dayton I* at JA204. On appeal, FERC highlights that neither of the Supreme Court's energy preemption decisions cited by the utilities—*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) and *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016)—began in agency proceedings. Rather, they began in federal district and state courts.

FERC's argument against our addressing preemption is unpersuasive for several reasons. As the utilities demonstrate, FERC has decided preemption questions in analogous settings. *See, e.g.*, *New Eng. Ratepayers Ass'n*, 168 FERC ¶ 61,169 (2019) (concluding that a New Hampshire law was preempted); *Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047 (2010) (concluding that California administrative orders were preempted); *Midwest Power Sys., Inc.*, 78 FERC ¶ 61,067 (1997) (concluding that Iowa administrative orders were preempted). And FERC discarded California's interpretation of its own law in proceedings underlying the *CPUC* cases. *CPUC II*, 29 F.4th at 461, 463–64. There, FERC decided not to defer to California's interpretation because the RTO adder was a creature of federal law, not state law. And FERC ultimately decided that CPUC's interpretation was incorrect and that California utility companies were not required to join an RTO, making them eligible for the adder. *Id.* at 461. Likewise, FERC already interpreted Ohio law in issuing its decision in the *Dayton Power* proceeding, and its ratemaking

decision presumes the validity of the Ohio law. FERC's sudden federalism concerns are difficult to reconcile with its past practices, given that it has not hesitated to resolve the state law questions that lie at the heart of ratemaking proceedings.

The utilities, moreover, are asking FERC to ignore the Ohio law in agency ratemaking proceedings, not invalidate it writ large. That may seem like a thin distinction, but it is an important one. In *CPUC II*, for example, FERC did not believe it needed to hew to the California agency's interpretation of California law when evaluating a federal rate incentive. *CPUC II*, 29 F.4th at 461, 463–64. But it didn't make a pronouncement that would have impact beyond its jurisdiction; a California court could rule differently. FERC just had the authority to interpret the law relevant to its impact on the RTO adder. Likewise, FERC can interpret the validity of Ohio law as necessary to carry out its ratemaking function. Its determination does not extend beyond those confines.

Accordingly, we next consider whether the FPA preempts Ohio law.

## 2.     Conflict Preemption

To begin, the utilities argue that the FPA preempts Ohio law because the two conflict. A state law conflicts with federal law if "it is impossible for a private party to comply with both state and federal law" or if the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (citation omitted). The utilities' continued membership in PJM, a FERC-approved RTO, demonstrates that compliance with both Ohio law and the FPA is possible. No party disputes that. The question, then, is whether Ohio's law stands as an obstacle to federal law or frustrates its purpose. The Supreme Court has recognized that this analysis is "a matter of judgment." *Id.* at 373. We examine whether, considering state law, the "purpose of the act cannot otherwise be accomplished," *id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)), and whether state laws "directly interfere[] with the operation" of a federal program, *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011).[12]

---

[12]Reviewing courts also assume that "the historic police powers of the States" are not preempted "unless that was the clear and manifest purpose of Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation &*

This is a high bar. Several justices view obstacle preemption with more skepticism because, unlike other types of preemption, it doesn't require an express statutory basis or clear legal conflict. *See Hillman v. Maretta*, 569 U.S. 483, 499–500 (2013) (Thomas, J., concurring) (criticizing obstacle preemption because it "looks beyond the text of enacted federal law and thereby permits the Federal Government to displace state law without satisfying . . . the Bicameral and Presentment Clause"); *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 777–79 (2019) (lead opinion of Gorsuch, J.); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 907 (2000) (Stevens, J., dissenting) (calling obstacle preemption "potentially boundless" and "inadequately considered"). Recognizing these concerns, the Supreme Court has cautioned that analyzing obstacle preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," which "would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Whiting*, 563 U.S. at 607 (cleaned up). And it has stated that finding obstacle preemption requires meeting "a high threshold." *Id.* (citation omitted).

This case does not meet that high bar. As discussed earlier, one of Congress's purposes in enacting Section 219 was to increase membership in RTOs. The Ohio law does precisely that. The utilities argue that Congress designed RTO membership to be voluntary, even as it sought to expand participation. They stress that in 2015, Congress directed FERC to "divide the country into regional districts for the *voluntary* interconnection and coordination of facilities." 16 U.S.C. § 824a(a) (emphasis added). In other words, the utilities argue, Ohio law "conflicts with federal law by mandating what Congress determined should be voluntary," Utilities' Br. at 37, and "frustrates the federal model of voluntary membership," *id.* at 44–45. The problem is that the utilities do not show that Congress "wanted to pursue" its voluntary model at "all costs," or at least at the expense of state law. *See Wyeth*, 555 U.S. at 601 (Thomas, J. concurring) (quoting *Geier*, 529 U.S. at 904 (Stevens, J., dissenting)). Congress's decision not to mandate RTO membership federally doesn't necessarily imply an intent to prevent states from imposing such

---

*Dev. Comm'n*, 461 U.S. 190, 206 (1983) (citation omitted). Historically, regulation of electricity transmission began as a state enterprise, *id.*, so FERC's intervenors urge us to apply preemption sparingly, *see* OCC Br. at 28; Ohio Br. at 8–9. We need not consider any presumption against preemption because even without it we conclude that the FPA does not preempt Ohio law mandating RTO participation.

requirements, especially when the state laws further Congress's overall goal of increasing RTO participation.  Congress may have wanted to prevent FERC from mandating membership via rule, not prevent Ohio from doing so.  To accept the utilities' argument would be to engage in the "freewheeling judicial inquiry" the Supreme Court forbids.  *Whiting*, 563 U.S. at 607 (citation omitted).

### 3.      Field Preemption

Next, the utilities argue that Congress has preempted the entire field, eliminating Ohio's authority to mandate RTO participation.  Field preemption exists where Congress legislates broadly enough "to occupy an entire field of regulation, leaving no room for the States to supplement federal law."  *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989).  The core question is whether the "scheme of federal regulation" is "so pervasive as to make reasonable the inference that Congress left no room to supplement it."  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (citation omitted); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 507–08 (1996).  For example, the Supreme Court has ruled that Congress, through its extensive schemes, preempted state immigration and nuclear-safety laws.  *See Arizona v. United States*, 567 U.S. 387, 401 (2012); *Pac. Gas*, 461 U.S. at 212–13.

The utilities, which bear the burden of demonstrating preemption, *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912–13 (6th Cir. 2007), argue that Congress has occupied the field of interstate electric transmission, including coordination through RTOs and similar organizations.  The utilities ground this argument in two sources: (1) the FPA; and (2) a Supreme Court case, *Hughes v. Talen Energy Marketing, LLC*.  Neither demonstrates that Congress preempted the entire field of interstate energy transmission.

We first turn back to the FPA.  It states that FERC "shall have jurisdiction over all facilities for [interstate] transmission or sale of electric energy [at wholesale]."  16 U.S.C. § 824(b)(1).  And it directs FERC to divide the country into regional districts to coordinate electric transmission.  *Id.* § 824a(a).  In arguing that Ohio law trespasses on this field, the utilities note that Ohio specifically regulates "transmission facilities as defined under federal law," Ohio

Rev. Code § 4928.12(A), and requires transmission owners with assets in Ohio to transfer operational control over to a transmission organization approved by FERC, *id.* § 4928.12(B)(1).

This argument is unconvincing. As an initial matter, the FPA's text does not grant FERC *exclusive* jurisdiction over interstate transmission facilities. Instead, it recognizes states' role in transmission regulation. Indeed, the sections of the FPA the utilities cite teem with references to state involvement. Congress, in a single sentence, both granted and limited FERC's jurisdiction. It authorized FERC's oversight "over all facilities for such transmission or sale of electric energy," while restricting its authority over "facilities used for the generation of electrical energy," "local distribution," "transmission . . . in intrastate commerce," and "transmission of electric energy consumed wholly by the transmitter." 16 U.S.C. § 824(b)(1). Furthermore, § 824(a) limits FERC's regulatory power over transmission, generation, and wholesale rates "only to those matters which are not subject to regulation by the States." Thus, Congress explicitly preserved state authority over certain transmission-related areas, including intrastate transmission and facilities supplying electricity to the transmitting entity itself.

Ohio's law fits within this scheme because it primarily regulates intrastate transmission. While state efforts to improve intrastate transmission reliability, efficiency, and costs may affect interstate transmission, such indirect impacts don't trigger field preemption. *Pacific Gas* illustrates this idea. There, the Supreme Court balanced its prior ruling on federal preemption of nuclear safety against Congress's explicit "authorization for states to regulate nuclear power plants for purposes other than protection against radiation hazards." *Pac. Gas*, 461 U.S. at 199 (cleaned up). The Supreme Court upheld a California law despite its incidental impact on nuclear safety regulation, reasoning that the law's purpose was to address economic planning issues for new nuclear plants rather than to regulate safety. *Id*. at 213–16; *see also Oneok*, 575 U.S. at 384–88 (rejecting notion that state antitrust laws with incidental effect on interstate wholesale rates were preempted because such preemption would nullify FERC's limited jurisdiction and Congress's express preservation of state authority over intrastate issues). The Supreme Court has "emphasize[d] the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok*, 575 U.S. at 385. For that reason, state actions indirectly affecting a federally regulated field are not necessarily preempted.

The same is true here. The Ohio law targets intrastate transmission—an area explicitly reserved for states by the FPA in § 824(a) and § 824(b)(1), so it withstands the utilities' preemption challenges. The text of the Ohio statute reveals that the legislature's primary aim was to regulate transmission within Ohio's borders. The statute repeatedly emphasizes its application to facilities and effects "located in this state" or "within this state." *See* Ohio Rev. Code § 4928.12(A), (B), (D). Moreover, the statute's attention to improving options and reliability for Ohio consumers also points to a primary concern with intrastate matters. *Id.* § 4928.12(B)(6). The statute highlights improving options and reliability for consumers and expresses concern for open competition "in the provision of retail electric service," *id.* § 4928.12(B)(5), which states (rather than FERC) regulate, *see Oneok,* 575 U.S. at 385–86 (determining that state law targeted "retail rates—which are firmly on the States' side" of the "dividing line" and therefore not field preempted (cleaned up)).

In exercising its intrastate authority, Ohio mandated membership in federally regulated entities and adopted federal standards. But, contrary to the utilities' argument, that doesn't demonstrate that Congress has preempted Ohio law. Instead, Ohio's incorporation of federal standards reflects an intent to cooperate with, rather than contradict, federal law.

The Public Utilities Regulatory Policy Act of 1978 (PURPA) further shows that Congress did not preempt all state laws intersecting with interstate transmission. PURPA allows—but does not require—FERC to exempt utilities from state laws hindering voluntary utility coordination. *See* 16 U.S.C. § 824a–1(a)(2). Leaving FERC the discretion to exempt utilities from these state laws shows that Congress knew about state laws affecting the coordination of electric utilities and chose not to preempt them. This framework tacitly acknowledges state authority over intrastate transmission, even when it affects *interstate* transmission. It also indicates that Congress intended FERC to selectively exempt utilities from state laws to achieve specific policy goals, rather than wholly preempt state regulation in this domain.

The utilities' reliance on *Hughes* is also unavailing. In *Hughes v. Talen Energy Marketing, LLC*, the Supreme Court recognized that the FPA endows FERC with "exclusive jurisdiction over wholesale sales of electricity in the interstate market." 578 U.S. at 153. Unlike this case, however, *Hughes* addressed a Maryland program that set "an interstate wholesale rate."

*Id.* at 163.  The Maryland program required a utility to join PJM, but then, in order to encourage new in-state generation, guaranteed it a different rate than FERC's scheme did.  *Id.* at 153, 158–59.  As the Court held, that "invades FERC's regulatory turf" because "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, as Maryland [did]."  *Id.* at 164.  Maryland's attempt to indirectly set an interstate wholesale rate is distinct from state laws targeted at areas outside wholesale ratemaking, but which may have incidental impacts on interstate wholesale rates.  Unlike the Maryland program in *Hughes*, state laws mandating RTO membership do not set wholesale rates, directly or indirectly.  And, in *Hughes*, the Supreme Court recognized cooperative federalism in the field of energy transmission outside of wholesale ratemaking, explicitly rejecting the notion that FERC is the sole regulator.  *Id.* at 166; *see id.* at 167 (Sotomayor, J., concurring) (noting that the FPA "envisions a federal-state relationship marked by interdependence" so "[p]re-emption inquiries" are "particularly delicate").

Moreover, the FPA's RTO regulations do not approach the extensive regulatory schemes in the Atomic Energy Act or Immigration and Nationality Act, which the Supreme Court concluded left "no room" for state action.  *See Arizona*, 567 U.S. at 400–01; *Pac. Gas*, 461 U.S. at 203–07.  In contrast, Congress not only permits but also anticipates state involvement in energy transmission regulation.  Accordingly, we conclude that the FPA does not impliedly preempt Ohio's law requiring RTO membership.

### C.        Dayton Power's Arbitrariness Claim

Dayton Power raises one final objection to the proceeding.  It argues FERC arbitrarily rejected its adder request, despite approving similar adders for transmission owners in PJM and nearby RTOs, "some of which are subject to state RTO membership mandates."  Utilities' Br. at 63.  FERC counters that Order 679 requires case-by-case evaluation of RTO adders, and attributes the inconsistency to differences in state law, not FERC policy.  We hold that FERC's distinction between Dayton Power and other utilities is not arbitrary, thus this claim fails too.

FERC's differential treatment is justifiable, so we don't disturb it. Critically, Ohio law mandates Dayton Power's RTO membership. Other PJM utilities operate within state statutory schemes that do not mandate RTO participation. FERC was still reviewing the RTO adders of other PJM utilities in Ohio, which explains any perceived unfairness between the Ohio utilities. Indeed, the *OCC* proceeding we discuss next tackles this topic head-on.

Dayton Power's monetary arguments are similarly unavailing. It claims that without the RTO adder, it is at a market disadvantage, particularly for capital improvements. The adder's purpose, however, is not to ensure competitiveness or capital attraction. Neither Order 679 nor Section 219(c) requires FERC to resolve economic disparities. By contrast, other existing ROE regulations are designed to address market fairness and access to capital. *Hope Nat. Gas Co.,* 320 U.S. at 603 (holding that an ROE must "be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital"); *see also supra* at 5–6 (discussing ROE calculation). Therefore, FERC's treatment of Dayton Power isn't arbitrary or capricious on these grounds.

## III.    The *OCC* Proceeding

FERC's ruling in the *Dayton Power* proceeding prompted a question about the rates of other utilities subject to Ohio law, including AEP, Duke, and FirstEnergy: did their rates include an RTO adder and, if so, what to do about it? Following *Dayton Power*, OCC petitioned FERC to revoke the RTO adder from each of these utilities. *OCC I* at JA464. FERC revoked AEP's adder but retained Duke's and FirstEnergy's. *Id.* at JA485. Both OCC and AEP appealed.

This challenge raises three questions. *First*, did FERC need to conclude that AEP's overall rate was unjust before striking the RTO adder? *Second*, did FERC arbitrarily strip the RTO adder from AEP's rate while keeping it in Duke's and FirstEnergy's? And *third*, did a prior FERC finding that AEP voluntarily joined an RTO preclude FERC's contrary conclusion on the RTO adder? We address each question separately.

A.        **Procedural Predicates**

AEP first argues that OCC must prove its overall rate (ROE + adder) was unjust and unreasonable before FERC can remove the adder. Neither FERC nor AEP cite any cases that address this question directly, but the FPA's text clarifies that FERC can revoke the adder without concluding that the entire rate is unjust.[13] Under Section 206, whenever FERC "find[s] that any rate, charge, or classification," or "any rule, regulation, [or] practice" is "unjust, unreasonable, unduly discriminatory or preferential," it "shall determine the just and reasonable" rate, charge, rule, or practice and "shall fix [it] by order." 16 U.S.C. § 824e(a). This includes the RTO adder. Following the plain language, because FERC concluded that its practice of granting RTO adders to Ohio utilities was wrong, FERC "shall fix" it. Here, that's by removing the RTO adder.

The text belies AEP's assertion that FERC must deem AEP's entire rate unjust and unreasonable before revoking the RTO adder. The statute refers to "any" rate, charge, rule, regulation, or practice. The utilities' interpretation would allow a utility to abandon its RTO membership and retain its adder (in direct conflict with the goals of Section 219 and Order 679) as long as its overall rate remained within the zone of reasonableness. We refuse to adopt the utilities' atextual reading of Section 206. Instead, FERC must "fix" any unjust or unreasonable practices, even though the OCC has not proven that the utilities' overall rates are unreasonable. And we next look to whether FERC appropriately fixed its practice with respect to AEP, Duke, and FirstEnergy.

B.        **Treatment of Duke's, FirstEnergy's, and AEP's Adders**

FERC decided to remove AEP's RTO adder, while leaving Duke's and FirstEnergy's transmission rates intact. And it justified its decision on differences in how these adders were

---

[13]FERC cites *International Transmission Co. v. FERC*, in which the D.C. Circuit held that FERC may take away an incentive adder for standalone transmission companies granted pursuant to Order 679 because the utility no longer qualified for the adder. 988 F.3d 471, 485–86 (D.C. Cir. 2021). There, the petitioners argued FERC had "fail[ed] to find the existing adders to be unjust or unreasonable before reducing them," but the D.C. Circuit determined that FERC had done so, notwithstanding its failure to use the words "unjust and unreasonable." *Id.* at 485. So the arguments presented in that case don't directly address the question here. *Id.* Nevertheless, its holding demonstrates that other courts have upheld FERC's revocations on a single-issue basis in other proceedings.

integrated into the utilities' respective rates. For AEP, FERC approved its RTO adder separately from the rest of its rate in 2008 and 2010. FERC considered AEP's application for the adder "on a single-issue basis, separate from all other ROE issues." *OCC I* at JA486; *Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 P 30 (2008); *AEP Appalachian Transmission Co.*, 130 FERC ¶ 61,075 P 21 (2010). After FERC approved the RTO adder, consumer groups challenged AEP's base ROE, and the parties reached a settlement that didn't affect the adder. *OCC II* at JA590 n.95, 593. By contrast, FERC did not approve adders for Duke and FirstEnergy on a single-issue basis; the adders comprised a part of broader settlements with consumer advocacy agencies. Then FERC approved those negotiated rates as just and reasonable. *OCC I* at JA468, 488. Thus, FERC determined that the three utilities were not similarly situated. It could easily excise its approval of AEP's RTO adder. *Id.* at JA486–87. Removing Duke's and FirstEnergy's adders, however, would require disentangling them from multi-issue settlements. *Id.* at JA488–89. FERC would not "disturb one aspect of these comprehensive settlements" without a showing that the overall rates were unjust and unreasonable. *Id.* at JA489.

FERC's reasoning, though logical at first glance, crumbles under scrutiny. A closer look at the utilities' rates and settlements exposes the weakness in FERC's justification.

Duke's and FirstEnergy's settlements, by their terms, acknowledged that they included 50-basis-point RTO adders. Duke's settlement specified "a 10.88% base cost of common equity and a 50-basis point ROE adder." *Id.* at JA488. FirstEnergy's settlement stated that "the agreed-upon ROEs were inclusive of any incentive adder for RTO participation." *Id.* And even though the FirstEnergy settlement did not explicitly describe that the adder was for 50 basis points, FERC treats it as if it did. Recall that FERC determines an appropriate base ROE for a utility by examining the ROE of a proxy group. When it includes FirstEnergy in a proxy group, FERC uses a figure 50 basis points below FirstEnergy's settled rate, suggesting it views the settled rate as including a 50-basis-point adder. *Id.* at JA482. Likewise, FirstEnergy's testimony in a separate proceeding that its base ROE is 9.88%, not the settled 10.38%, confirms a 50-basis-point adder. *Id.* at JA488–89. Thus, the evidence indicates that Duke's and FirstEnergy's rates parallel AEP's: a base negotiated ROE with a 50-basis-point RTO adder. *See also* Electric

Transmission Incentives Policy, 86 Fed. Reg. at 21973 (noting FERC has always granted RTO adders of 50 points). Yet FERC treats these utilities disparately.

Contrary to FERC's assertion, whether it approved the RTO adder explicitly on a "single-issue" basis or impliedly as part of a settlement makes little difference to how the three utilities approached rate negotiations. At the time, FERC routinely granted a 50-basis-point adder to utilities joining an RTO, regardless of state law. *See* Background Section III, *supra*. Therefore, going into rate negotiations—with or without formal approval of the RTO adder—all parties (the utilities and the consumer groups) understood that AEP, Duke, and FirstEnergy alike would get a 50-basis-point adder for RTO membership. While FERC asserts that "no incentive is automatic," it concedes that at the time, Duke and FirstEnergy would likely have received the adders had they applied separately. FERC Br. at 61; *OCC II* at JA586–87 ("We recognize that, if Duke and ATSI had sought an RTO Adder at that time (i.e., prior to *CPUC*) outside the settlement context, an RTO Adder likely would have been granted."). And past practice shows that it was nearly automatic. *CPUC I*, 879 F.3d at 971–72. Thus, the fact that AEP Ohio affiliates "went into [their rate settlement] negotiation with their previously granted [RTO adder] already in hand" is largely inconsequential. FERC Br. at 53.

FERC tells us it's difficult to understand how the adder impacted Duke's and FirstEnergy's settlements, including "the precise trade-offs and concessions made by the parties to those proceedings." *Id.* at 62 (citation omitted). Maybe so, but that's also true for AEP. AEP went into its negotiations with a 50-basis-point adder and may have agreed to a more modest base ROE or other concessions knowing the adder would be layered on the settled ROE. Therefore, AEP makes a valid case for equal treatment.

While AEP dismantles FERC's explanation for treating Duke and FirstEnergy differently, its logic doesn't warrant *preserving* the adder for all three utilities. If all three utilities' rates were based on settlements and can be separated into a base ROE and a 50-basis-point RTO adder, then, as with AEP—and to comply with Section 219(c) and Order 679—FERC must also remove the RTO adder for Duke and FirstEnergy. We conclude, therefore, that FERC acted arbitrarily and capriciously both by treating AEP differently from Duke and FirstEnergy,

and by continuing to approve the adder (expressly or impliedly) to utilities that had not joined an RTO voluntarily.

C.        **Regulatory Estoppel**

AEP's final argument is that FERC, in removing its RTO adder, arbitrarily departed from its 2004 finding that AEP voluntarily joined PJM. *See New PJM Cos.*, 107 FERC ¶ 61,271 PP 41–44 (2004); *New PJM Cos.*, 106 FERC ¶ 63,029 P 55 (2004). When FERC adjudicated that case, Ohio's law mandating RTO membership was already on the books, so AEP contends that circumstances have not changed such that FERC can now depart from its prior finding that AEP joined PJM voluntarily.

AEP's grasping onto a two-decades old order from a different context cannot save its RTO adder. In the 2004 adjudication, FERC evaluated whether AEP-East, which operates in six states, qualified for PURPA-based exemptions from a Virginia regulation that prevented it from joining PJM. *See New PJM Cos.*, 107 FERC ¶ 61,271 PP 1–2, 64–65. To qualify for an exemption, AEP-East needed to show "voluntary coordination" with other utilities, and FERC concluded that it had. *Id.* PP 31, 41–44. The analysis didn't specifically focus on AEP-East's Ohio affiliates; indeed, one of the two affiliates central to this case didn't exist in 2004. Rather, it addressed whether, under PURPA, FERC could exempt AEP-East from Virginia laws that were "stand[ing] in the way of AEP's integration into PJM." *Id.* P 2.

The question of whether an AEP parent company voluntarily integrated into PJM under PURPA and Virginia law differs fundamentally from whether AEP's Ohio affiliates were legally mandated to join a transmission organization under the FPA and Ohio law. These distinct inquiries justifiably led to different conclusions, especially considering developments in the law since 2004, like Congress amending the FPA to create Section 219, FERC promulging Order 679, the Ninth Circuit deciding *CPUC I*, and FERC deciding *Dayton Power*. FERC's decision not to give the PURPA finding preclusive effect here was neither arbitrary nor capricious.

**CONCLUSION**

We affirm FERC's denial of Dayton Power's application for an RTO adder in the *Dayton Power* proceeding and its revocation of AEP's RTO adder in the *OCC* proceeding. We reverse FERC's order in the *OCC* proceeding declining to revoke the RTO adder from Duke's and FirstEnergy's adder-inclusive settlement rates and remand for further proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

NALBANDIAN, Circuit Judge, concurring.  I join the majority opinion in full.  Our task is to "exercise independent judgment" in finding the "single, best meaning" of Section 219(c) of the Federal Power Act.  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262, 2266 (2024).  The single, best meaning here is that adders, offered as "incentives" for joining transmission organizations, should not go to utilities already required to join those organizations.  I write separately to underscore one point about so-called "*Skidmore* deference" and what weight, if any, we give an agency's interpretation of a statute now that the Supreme Court has overruled the *Chevron* doctrine.  *See Loper Bright*, 144 S. Ct. at 2273 (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

The point is this: the term "*Skidmore* deference" is, strictly speaking, a misnomer.  Deference, as we mean it in the agency context, involves one interpreter yielding or submitting to another interpreter's views.  But *Skidmore v. Swift & Co.* just directs courts reviewing agency action to consider the agency's views with respect, insofar as they are well-reasoned, consistent over time, and informed by the agency's expertise.  323 U.S. 134, 139–140 (1944).  Properly understood, *Skidmore* recognizes that agencies have the "power to persuade," not the power to bind.  *Id.* at 140.  We would more accurately describe this doctrine as "*Skidmore* respect," not "*Skidmore* deference."

Decided two years before the enactment of the Administrative Procedure Act (APA), *Skidmore* dealt with a question of firefighters' overtime pay under the Fair Labor Standards Act. *Id.* at 135–36.  In reaching its decision, the Supreme Court acknowledged the "considerable experience" of the Administrator of the Wage and Hour Division, whose legal arguments were "entitled to respect."  *Id.* at 137, 140.  But the Court also made clear that the Administrator's reading of the law did not bind reviewing courts.  That reading was persuasive authority only. "The rulings, interpretations, and opinions of the Administrator," the Court explained, were "not controlling upon the courts," though they did "constitute a body of experience and informed

judgment to which courts and litigants may properly resort for guidance." *Id.* at 140. The weight a reviewing court gave to the executive branch would "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* In other words, an agency's view is persuasive if it's persuasive. And it's not if it's not.

*Skidmore* thus fit comfortably into "the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 144 S. Ct. at 2262. It was a sort of restatement of the canon stretching back into English common law that longstanding, consistent expositions of a law by political actors deserved some weight, even considerable weight. *Id.* at 2257–59; Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908, 933–38, 979 (2017). So when the APA codified the traditional understanding of the judicial function, nothing displaced—or expanded—*Skidmore*'s instructions. *Loper Bright*, 144 S. Ct. at 2261–62.

Even when, decades later, *Chevron* began directing courts to defer to suboptimal but permissible agency interpretations, *Skidmore* hung around, a backstop of sorts for agency arguments that may not have merited full *Chevron* deference but that could nonetheless convince, if not bind. *See United States v. Mead*, 533 U.S. 218, 234–35 (2001). And with *Chevron* now scuttled, *Skidmore* has taken on new life. Citing *Skidmore*, *Loper Bright* pointed out that even fresh review of agency action will benefit from expert agency arguments. 144 S. Ct. at 2262. Following this lead, courts have invoked *Skidmore* both in accepting agency interpretations and in rejecting them. *Compare, e.g.*, *Lopez v. Garland*, 116 F.4th 1032, 1038–41 (9th Cir. 2024) (finding a Board of Immigration Appeals ruling "entitled to '*Skidmore* deference'"), *with In re MCP No. 185*, No. 24-7000, 2024 WL 3650468 (6th Cir. Aug. 1, 2024) (staying an FCC rule); *id.* at *5–6 (Sutton, C.J., concurring) (questioning, as to *Skidmore*'s consistency factor, the FCC's flip-flopping on a statute's meaning). In future cases, natural litigating incentives may lead agencies to make the most out of *Skidmore* and regulated parties to minimize it, emphasizing that we must check the agency's homework.

But make no mistake: *Skidmore* "respect" is just that. *Cf. Loper Bright*, 144 S. Ct. at 2258. Nothing more. It's a reminder that agencies often know what they're talking about. Their views do not "supersede" ours, even if they do "inform" it. *Id.* And that has always been true. We carefully consider *any* litigant's reasoning and how compelling it is.

Others have put this point more bluntly. Justice Scalia, for one, described *Skidmore* respect as "an empty truism and a trifling statement of the obvious: A judge should take into account the well-considered views of expert observers." *Mead*, 533 U.S. at 250 (Scalia, J., dissenting); *see also Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 619 (5th Cir. 2024) ("[I]t seems that either the agency's interpretation is the best interpretation (in which case no deference is needed) or the agency's interpretation is not best (in which case it lacks persuasive force and is not owed deference)."). Much of the scholarly commentary agrees. *See* Adrian Vermeule, *Deference and Due Process*, 129 Harv. L. Rev. 1890, 1901 (2016) ("*Skidmore* just describes the attitude of any minimally sensible decisionmaker, who listens to any relevant arguments of well-informed parties when deciding what to do."); David J. Barron & Elena Kagan, Chevron*'s Nondelegation Doctrine*, 2001 Sup. Ct. Rev. 201, 227 n.98 (suggesting that *Skidmore* means little more than "a court saying 'we will defer to the agency if we believe the agency is right'"); John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612, 686, 688 (1996) (calling *Skidmore* a "nonbinding version of deference" from courts "exercising independent judgment").

*Skidmore* respect thus roughly tracks how we consider the interpretations of other circuit courts. We are not bound by the decisions of our sister circuits, but we look to them for guidance and thoughtful consideration. If we are persuaded by another court's reasoning, we adopt it. And if we're not, we don't. So too with agencies. As a practical matter, appellate courts are "likely to confer at least some mild epistemic authority on expert agencies, much in the way, for example, the Tenth Circuit likely treats Second Circuit opinions on securities litigation with more respect than those of a district judge in New Mexico." Jeffrey A. Pojanowski, *Neoclassical Administrative Law*, 133 Harv. L. Rev. 852, 884 n.170 (2020); *see also* Thomas W. Merrill, *Judicial Deference to Executive Precedent*, 101 Yale L.J. 969, 1019–20 (1992) ("In determining whether to follow nonbinding precedents in the judicial context, such as

decisions of courts of coordinate jurisdiction, courts frequently consider how persuasive the reasoning of the other court is . . . . The same pattern is followed in the executive precedent context.").

*Chevron* deference, by contrast, required us to apply an agency's permissible reading of a statute even if we would have read it differently. The agency acted less like a sister circuit and more like a state court whose construction of a state statute we would accept. *See Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993). That is why I suspect that speaking of *Skidmore*'s doctrine as one of "deference" (even mild deference or "deference lite!") may confuse more than it clarifies.

To be sure, there is much overlap between the *Chevron* and *Skidmore* (or *Loper Bright*) analyses. An agency that arrives at the best reading of a statute would win under yesterday's regime as well as today's, and an agency that plainly strays beyond its authority would lose under both. In many cases, "either approach [would] lead to the same result." Cass R. Sunstein, Chevron *Step Zero*, 92 Va. L. Rev. 187, 229 (2006); *see also* Adrian Vermeule, *The Old Regime and the* Loper Bright *Revolution*, 2024 Sup. Ct. Rev. (forthcoming 2025) (manuscript at 9–12) (similar). So there's reason to be skeptical that all that much will change. But it still matters *how* we decide cases, as well as *what* we decide. And there will be cases that agencies now lose when they might have previously prevailed. *See, e.g.*, *In re MCP No. 185*, -- F.4th --, No. 24-7000, 2025 WL 16388, at *3–4 (6th Cir. Jan. 2, 2025) (finding the FCC's net neutrality order—previously upheld as "permissible" under *Chevron*—inconsistent with the Communications Act of 1934).

Whatever we call *Skidmore*'s lesson—"deference," "respect," "due respect," "weight," "consideration," "careful attention"—the label should not distract from the fact that its referent comes down to persuasion, not control; epistemic, rather than binding, authority. I suggest that we not worry about calculating what precise quantum of "deference" or "respect" *Skidmore* may call for. It seems to me more profitable to simply take *Loper Bright* at face value and tackle statutory interpretation questions head-on with our traditional judicial toolkit. Which includes, of course, consulting the expertise of the parties.

In this case, FERC argued that *Loper Bright* "does not preclude deference" to its interpretation.  D. 109, FERC Resp. to 28(j) Letter.  As the majority explains, any deference (or "respect," or what have you) would make no difference because FERC already has the better reading of the statute.  Maj. Op. 18–19.  The agency's view coincides with ours.  But moving forward, the language of "deference"—so familiar from the *Chevron* days—should not lead anyone astray.  Our job is to interpret statutes and exercise independent judgment, with or without all the help we can get.

With these observations, I concur.

---

**CONCURRENCE / DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I join Parts I, II(A), II(B)(2), II(B)(3), II(C), and Parts III(A) and (C) of the majority's Analysis and incorporate its summary of the factual and procedural history in this case.[1] But, because FERC did not act arbitrarily and capriciously by allowing Duke and FirstEnergy to retain their RTO adders while stripping AEP's, I respectfully dissent from Part III(B) of the majority opinion's Analysis Section regarding the *OCC* Proceeding. And I do not join Part II(B)(1) of the Analysis Section on preemption because I agree with the majority's conclusion that the Ohio statute is not preempted and therefore find it unnecessary to analyze FERC's approach to preemption issues.

Section 205 of the FPA provides that FERC has jurisdiction over "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy," and that all such rates must be "just and reasonable." 16 U.S.C. § 824d(a)–(b), (e); *see* FERC Br. at 5. Section 206 of the FPA further authorizes FERC, on its own motion or on complaint by a third party, to determine whether a rate under its jurisdiction is "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). In such a proceeding, the burden of proof is on the complainant. *Id.* § 824e(b). Section 219, which requires FERC to "provide for incentives to each transmitting utility or electric utility that joins a[n] [RTO]" incorporates the same standard, requiring that incentives like the RTO adder be "just and reasonable and not unduly discriminatory or preferential." *Id.* § 824s(c), (d).

Under the APA, this court may "set aside" a final agency if action if we find it to be "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (*State Farm*) (quoting 5 U.S.C. § 706(2)(A)). "When determining whether a final agency action is

---

[1] I also adopt the majority's terminology and abbreviations for the various relevant entities, statutes, documents, and concepts.

arbitrary or capricious, the scope of our review is 'an extremely narrow one.'" *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 720 (6th Cir. 2022) (quoting *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1352 (6th Cir. 1991)). "[A] reviewing court may not set aside an agency [action] that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *See State Farm*, 463 U.S. at 42–43.

In the instant context, FERC and the courts both have long taken the position that "settlements of rate proceedings are to be encouraged." *United Mun. Distrib. Grp. v. FERC*, 732 F.2d 202, 209 (D.C. Cir. 1984). Indeed, the APA expressly requires regulatory agencies to consider offers of settlement from interested parties. 5 U.S.C. § 554(c)(1). "The whole purpose of the informal settlement provision is to eliminate the need for often costly and lengthy formal hearings in those cases where the parties are able to reach a result of their own which the appropriate agency finds compatible with the public interest." *Pa. Gas & Water Co. v. Fed. Power Comm'n*, 463 F.2d 1242, 1247 (D.C. Cir. 1972). This "strong support of settlements" "giv[es] . . . parties certainty, and let[s] them receive the full benefits of their bargain." *State of Maine*, 91 FERC ¶ 61,213, 61,772 (2000). Such certainty is key in encouraging parties to resolve their disputes through settlement. As concluded by the D.C. Circuit, "it [is] obvious that [parties] might hesitate to enter rate settlements if" subsequent developments "could later pull the rug out from under them." *Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 407 (D.C. Cir. 2005).

FERC's actions in the *OCC* proceedings were consistent with this pro-settlement policy, which provided a legitimate basis to distinguish between AEP on the one hand and Duke and FirstEnergy on the other. Although the Commission determined that AEP's RTO adder was unjust and unreasonable because AEP was mandated by state law to join an RTO and therefore did not do so voluntarily, the Commission reasonably held that it would not be unjust and unreasonable to leave Duke's and FirstEnergy's rates untouched because "Duke's and [FirstEnergy]'s ROEs, including any adders, were each embedded in a comprehensive settlement package submitted to the Commission to resolve a complex, multi-issue dispute among those entities, their customers, and other affected parties." *OCC I* at JA488; *see id.* at JA485–88. The

Commission continued that it did "not know the precise trade-offs and concessions made by parties to those proceedings during the settlement process and the terms to which and conditions to which those parties would have agreed with respect to Ohio transmission assets had the Commission policy on RTO Adders been different." *Id.* at JA488. Importantly, the Commission made clear that it did not affirmatively "f[ind] that Duke and [FirstEnergy] are entitled to an RTO Adder," only that, Ohio law notwithstanding, OCC had failed to carry its burden to show that Duke's and FirstEnergy's bargained-for RTO adders were unjust and unreasonable. *Id.* at JA489.

This result makes sense. If FERC had accepted OCC's invitation "to change unilaterally a single aspect of such a comprehensive settlement," *id.* at JA488, the Commission could have signaled to parties that their settlements could become *unsettled* as a result of later legal developments in which the parties had little say. This in turn would rob the settlement process of the certainty and predictability that incentivize settlements and thereby enhance administrative efficiency in support of the public good.

It was well within FERC's authority to balance these concerns in adjudicating the future of Duke's and FirstEnergy's RTO adders. "The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008). "FERC thus 'enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines.'" *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 992 (D.C. Cir. 2022) (quoting *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010)). And, given our "extremely narrow" review of the way FERC chose to balance competing regulatory objectives—FERC's desire to incentivize voluntary RTO participation against its policy of encouraging settlements—I cannot say that FERC's retention of Duke's and FirstEnergy's RTO adders was arbitrary and capricious. *See Oakbrook Land Holdings, LLC*, 28 F.4th at 720 (quoting *Navistar Int'l Transp. Corp.*, 941 F.2d at 1352); *see also Morgan Stanley Corp. Grp. Inc.*, 554 U.S. at 532. It was within FERC's discretion as policy maker to determine that, in light of the important role settlement agreements play in FERC's adjudication of rate disputes, it would not be unjust or unreasonable to preserve the integrity of

Duke's and FirstEnergy's agreements by declining to strip out each's RTO adder. *Brooklyn Union Gas Co.*, 409 F.3d at 407 ("FERC hardly abused its discretion in holding that a strong commitment to preexisting settlements would better serve the public interest than allowing modifications" not agreed to by all parties); *United Mun. Distrib. Grp.*, 732 F.2d at 209 (FERC acted in accordance with law when its action "serve[d] [its] salutary policy by preserving a settlement").

Nor, in my view, did FERC act arbitrarily or capriciously by treating AEP differently. Unlike Duke and FirstEnergy, AEP did not obtain its RTO adder through a comprehensive settlement, but instead sought and received specific evaluation and approval of its RTO adder. *OCC I* at JA486. Only then did AEP enter into a settlement agreement for its ROE, and so, the Commission reasoned, "when the parties entered into settlement discussions, they knew they were negotiating only the base ROE." *Id.* at JA486 & n.123. As relevant to FERC's policy in favor of preserving settlements, AEP was not similarly situated to Duke and FirstEnergy because AEP's RTO adder did not come from (and the adder's removal could not disrupt) such a comprehensive settlement. FERC's disparate treatment of AEP was thus "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *State Farm*, 463 U.S. at 42.

The majority says otherwise. Its contention is that all three utilities would have gone into their respective settlement negotiations knowing that they would receive a 50-basis-point adder, the standard at the time. True enough, had each utility applied directly to FERC for its RTO adder (as AEP did), at the time, FERC would likely have granted each a 50-basis-points adder. *See Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966, 972 (9th Cir. 2018). But Duke and FirstEnergy did not do so, instead choosing to settle. And it does not necessarily follow that, just because FERC's practice at the time was to grant a standard 50-basis-point adder upon request, the parties could not have negotiated for a lower or higher adder in return for other concessions. After all, no one contends that FERC would not have approved a settlement with an RTO adder other than 50 basis points. I therefore do not find it legally relevant that the parties likely knew what RTO adder they would receive *outside* the settlement process, given that the purpose of settlements is to allow "the parties . . . to reach a result of their own which the appropriate

agency finds compatible with the public interest."[2]  *Pa. Gas & Water Co.*, 463 F.2d at 1247. Such a result is unlikely to match precisely the result the parties would have received absent settlement.  That is the reason parties settle in the first place.

The majority then reverses course to suggest that, just as with Duke and FirstEnergy, it was "difficult to understand how the adder impacted" AEP's settlement because "AEP went into its negotiations with a 50-basis-point adder and may have agreed to a more modest base ROE or other concessions knowing the adder would be layered on the settled ROE."  Maj. Op. at 32. But, taken to its logical extreme, that statement is true of any agreement or contract.  What a party is willing to give up or accept in negotiations is necessarily shaped by circumstances existing at the time of the negotiations.

The majority, believing that AEP is similarly situated to Duke and FirstEnergy (whether because the impact of each RTO adder was known or because it was unknown), would apply to Duke and FirstEnergy the same logic that formed the basis for the Commission's decision to strip AEP of its adder.  But the majority does not explain why, in the first place, it was outside of FERC's power to preserve the finality of Duke's and FirstEnergy's comprehensive settlements. Even if the majority were correct that all three parties are similarly situated, the majority has not explained why all three parties should lose, rather than keep, their adders.[3]  Although the majority suggests that the same standard should apply to all three utilities, it does not explain thoroughly what that standard should be.

As discussed above, AEP was not similarly situated to Duke and FirstEnergy.  It was therefore not arbitrary or capricious for FERC to balance competing objectives by retaining

---

[2]Nor do I find it relevant that, as the majority writes, "[w]hen it includes FirstEnergy in a proxy group, FERC uses a figure 50 basis points below FirstEnergy's settled rate, suggesting it views the settled rate as including a 50-basis-point adder."  Maj. Op. at 31.  FERC uses proxy groups to calculate a *zone* of reasonableness, *id.* at 6, and so FERC's use of FirstEnergy's rates in such a calculation for another utility should not be taken as a definitive statement of the value of FirstEnergy's adder.  FirstEnergy's settlement was silent as to the precise value of its RTO adder.  *OCC I* at JA488.  And regardless, the important variable is not the precise value of each utility's RTO adder, but the (known or unknown) impact of said adder on each utility's overall settlement terms.

[3]I caution that, if the majority's reasoning were taken to mean that all three utilities should keep their adders, parties would be able preserve their previously granted adders by entering later, distinct settlement agreements and arguing that the substance of such settlements may have been influenced by the existing adder in unknown ways, effectively insulating the parties' rates from FERC's review.

Duke's and FirstEnergy's RTO adders in light of FERC's policy encouraging settlements while simultaneously removing AEP's adder, which did not arise from such a settlement.

Accordingly, I would **AFFIRM** each of the orders on review.